UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

NORTHERN GROUP INC.,

        Plaintiff,

        v.                                                    Case No. 17-C-1367

TECH 4 KIDS INC.,

        Defendant.

## DECISION AND ORDER

This action arises out of a 2008 oral agreement between a toy manufacturer, Tech 4 Kids Inc. (T4K), and a company hired to help drive sales for the toys produced, Northern Group Inc. Northern Group alleges it is owed post-termination commissions from T4K for sales made and payments received from customers whose orders were obtained through Northern Group's efforts. Northern Group asserts claims of breach of contract, breach of the implied duty of good faith and fair dealing, and violations of Wisconsin's statute regarding the payment of commissions to independent sales representatives, Wis. Stat. § 134.93. It also seeks relief under the procuring cause doctrine. The court has diversity jurisdiction based upon 28 U.S.C. § 1332. Presently before the court is T4K's motion for summary judgment. For the following reasons, the motion will be denied.

## BACKGROUND

T4K was in the business of manufacturing toys and had a difficult time getting its products into United States retailers. Def.'s Proposed Findings of Fact (DPFOF) ¶ 2, Dkt. No. 49; Pl.'s Proposed Findings of Fact (PPFOF) ¶ 2, Dkt. No. 55. In 2008, Brad Pedersen of T4K contacted Olen Rice, Northern Group's president, requesting that Northern Group assist T4K in its efforts

to develop its business in the United States. DPFOF ¶¶ 3–4. Northern Group and T4K formed an oral agreement by which Northern Group would represent T4K before toy retailers as its sales representative. *Id.* ¶¶ 5–6. Northern Group understood that it would be in a "pioneering mode," meaning that T4K had no business and that it would take a number of years before T4K generated sales and Northern Group earned commissions. *Id.* ¶ 8. T4K would compensate Northern Group for its efforts through a commission, which was calculated as a percentage of orders that T4K's retail customers paid. *Id.* ¶ 16. Northern Group agreed to accept a 5% rate on sales of T4K's products procured by Northern Group. *Id.* ¶ 7. The parties did not discuss the duration of the agreement or what would happen upon termination of the agreement by any party. *Id.* ¶¶ 9–10.

Once hired by T4K, Rice began calling on key retail partners, such as Kmart, Walgreens, Kohl's, Fleet Farm, Shopko, and Menards, to try to schedule opportunities to present T4K products. PPFOF ¶ 7. The sales process began with Northern Group representatives traveling to the retailer to present the product line, submit quotes, and provide samples. *Id.* ¶ 12. The retailer reviewed the products presented and finalized their selections. *Id.* Once the products were selected, Northern Group worked with the retailer to develop the standardized store layout that dictated where the product would be located in the store, commonly referred to as a planogram. *Id.* ¶ 14. Northern Group also worked with the retailer to build out inventory plans, establish shipment dates for initial orders, and establish inventory flow plans to predict the amount of product for the life of the program. *Id.* ¶¶ 13, 17. Once the planogram was confirmed, the store reserved space for the product in each of its locations and made a commitment to buy T4K products. *Id.* ¶ 15. The commitment did not specify any quantity of product to be purchased. The discussions related to setting the planogram, developing the business plan, and testing the product all occurred long before orders were generated. *Id.* ¶ 16. Rice began working with

2

retailers twelve to fifteen months in advance of when retailers would carry the products in their stores. *Id.* ¶ 10. The lag time between a retailer selecting a product for its planogram and receiving shipments was caused by the fact that the manufacturer had to go to Asia, secure raw materials, schedule manufacturing, and test the product. *Id.* ¶ 11.

Historically, T4K paid Northern Group its commission only after the retailer to whom T4K goods had been shipped had paid T4K for those orders. DPFOF ¶ 17. The commission was calculated on a quarterly basis for orders which shipped in that quarter, and only paid to Northern Group by T4K upon T4K's receipt of payment by the customer. *Id.* ¶ 18. Not once in the entire life of the relationship between Northern Group and T4K was Northern Group paid anything by T4K at the point it secured a commitment from a retailer to sell T4K's products. *Id.* ¶ 14. In 2015, Northern Group and T4K agreed that the commission rate for Northern Group would be reduced from 5% to 4% for paid orders that shipped after January 1, 2016. *Id.* ¶ 15.

On October 18, 2016, Pederson informed Rice during a telephone conversation that Northern Group was terminated as T4K's sales representative, effective immediately. *Id.* ¶ 19. Pederson later expressed to Rice that T4K had elected to terminate its relationship with Northern Group because Rice was establishing a new company to compete with T4K. *Id.* ¶ 24. Rice disputes that his business competed with T4K. Pl.'s Reply to DPFOF ¶ 24, Dkt. No. 54. T4K hired David Appleby of Millennium Sales Group to be the new sales representative for Northern Group's account. T4K had hired Appleby before communicating the termination decision to Northern Group. PPFOF ¶ 29.

After T4K notified Northern Group that it was terminating the representation pursuant to the oral agreement, Steve Beilman of T4K communicated with Rice to determine a cutoff date for shipments and programs Northern Group would be paid commission on. DPFOF ¶ 20. T4K

3

offered to pay commissions for all orders on Northern Group accounts through December 31, 2016, and initial set orders in Spring 2017. PPFOF ¶ 21. Rice viewed the offer to pay on orders through the end of the year as effectively meaningless, because retailers already had their products in stock for the holidays and would not place new orders, and requested that commissions be paid on the programs already in place that were scheduled to run through 2017–2018. *Id.* ¶¶ 22–23.

T4K only paid commissions for existing reorders of T4K's products that occurred in 2016 and did not pay any commissions for orders in 2017. *Id.* ¶ 33. Northern Group claims the parties had an ongoing agreement that Northern Group would be paid for the work it did to secure business for T4K. *Id.* ¶ 31. At the time of termination, Northern Group had secured programs set to run in 2016–2017 with Fleet Farm, Shopko, Kmart, and Walgreens. *Id.* ¶¶ 25, 30. T4K did not pay any commissions for the life of the programs secured by Northern Group. *Id.* ¶ 33. Although Northern Group asserts that it performed significant work to secure commitments for 2017 and 2018, T4K maintains that Northern Group did not secure business for 2018 because T4K did not have 2018 product to show potential retailers. *Id.* ¶ 32. T4K received $2,412,403.03 from sales to Northern Group accounts in 2017, which equates to $120,620.15 in commissions if calculated at 5% of total sales. *Id.* ¶ 34. T4K also admits it received $701,724.35 from sales to Northern Group accounts from January 1, 2017, through August 31, 2018, which equates to $35,086.22 in commissions if calculated at 5% of total sales. *Id.* ¶ 35.

## LEGAL STANDARD

Summary judgment is appropriate when the movant shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence and make all reasonable inferences that favor them in the light most favorable to the non-moving party.

4

*Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

**A. Breach of Contract**

Northern Group alleges that T4K breached the oral agreement by failing to pay Northern Group for commissions it believes it was entitled to receive. To recover for breach of contract under Wisconsin law, the plaintiff must establish "(1) a contract between the plaintiff and the defendant that creates obligations flowing from the defendant to the plaintiff; (2) failure of the defendant to do what it undertook to do; and (3) damages." *Brew City Redevelopment Group, LLC v. The Ferchill Group*, 2006 WI App 39, ¶ 11, 289 Wis. 2d 795, 714 N.W.2d 582 (citing *Northwestern Motor Car, Inc. v. Pope*, 51 Wis. 2d 292, 296, 187 N.W.2d 200 (1971)).

Northern Group asserts that it is entitled to compensation for the commitments it secured prior to termination. After the termination of the oral agreement, T4K agreed to pay commissions on all orders on Northern Group accounts through December 31, 2016 and initial set orders in the Spring of 2017. T4K asserts that it did not breach the oral agreement because it paid Northern

Group for all of the paid orders received through the term of the agreement. It contends that Northern Group was never paid commissions based on a retailer's commitment to place orders for the products and that commissions were not due until after it received a paid order from the retailer.

Northern Group does not dispute that T4K did not have an obligation to pay commissions when Northern Group secured a commitment from a retailer to feature T4K's product. Instead, it asserts that it is owed commissions when the commitment ultimately results in a sale, irrespective of when T4K received payment for the products sold. Northern Group maintains that at the time of the termination, it had secured program sets to run from 2016–2017 with Fleet Farm, Shopko, Kmart, and Walgreens and it had performed substantial work to secure commitments for programs to run from 2017–2018.

Based on the record before the court, it appears a material dispute of fact exists as to whether Northern Group's efforts resulted in a retailer's commitment and the subsequent purchase of T4K's products. In other words, did Northern Group procure the sales, even though the specific numbers and kinds of T4K products purchased by the retailers had not yet been determined prior to T4K's termination of the relationship? The fact that T4K had not previously paid commissions until the sale had been finalized does not mean that Northern Group had not completed most, if not all, of its bargained for performance. It simply means the amount of its compensation could not be determined until payment had been made. T4K contends that more work remained even after the retailers had made their commitments, but the record is not clear as to what remained to be done and how significant that work was in relation to the whole. On this record, a reasonable jury could find that Northern Group had procured the later sales at the time of termination with only the specific amounts left to be determined. If so, the jury could also find that T4K breached

the contract by failing to pay Northern Group commissions on commitments it had secured that had resulted in purchased product. Accordingly, the court denies T4K's motion for summary judgment on Northern Group's breach of contract claim.

**B. Breach of the Implied Duty of Good Faith and Fair Dealing**

T4K asserts that summary judgment is appropriate on Northern Group's claim that T4K breached the implied duty of good faith and fair dealing because T4K did not deny Northern Group any benefit of the parties' bargain. It is well-settled that Wisconsin law recognizes the implied duty of good faith and fair dealing in every contract. *See Beidel v. Sideline Software, Inc.*, 2013 WI 56, ¶ 27, 348 Wis. 2d 360, 842 N.W.2d 240. The implied duty has been summarized by Wisconsin courts as follows:

> Parties to a contract have a duty of good faith to each other. . . . [I]t may be said that contracts impose on the parties thereto a duty to do everything necessary to carry them out. . . . Moreover, there is an implied understanding in every contract on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out his part of the agreement, or do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

*Metropolitan Ventures, LLC v. GEA Assocs.*, 2006 WI 71, ¶ 35, 291 Wis. 2d 393, 717 N.W.2d 58 (citations and quotation marks omitted). Whether there has been a breach of the implied duty of good faith and fair dealing is generally a question for the factfinder. *See Tang v. C.A.R.S. Prot. Plus, Inc.*, 2007 WI App 134, ¶ 41, 301 Wis. 2d 752, 734 N.W.2d 169 (citation omitted).

Northern Group asserts that T4K breached the implied duty when it terminated the oral agreement, effective immediately, after Northern Group had secured commitments but before the products had shipped to the retailers. It maintains that it had worked to secure commitments for programs set to run through 2017 and 2018 but T4K hired a replacement sales representative at a lower commission percentage to cover Northern Group's accounts. Northern Group contends that

7

T4K terminated Northern Group and hired a replacement at a lower commission rate to pay fewer commissions on the programs secured by Northern Group. Construing all facts in favor of Northern Group, as the court is required to do at this stage, Northern has created a dispute of fact as to whether T4K breached the implied duty. Because these factual disputes can only be resolved by a jury, the court must deny T4K's motion for summary judgment with respect to this claim.

**C. Procuring Cause Doctrine**

Northern Group asserts that T4K is liable under the procuring cause doctrine. The procuring cause doctrine provides that a selling agent "is entitled to commissions when he or she 'procures an order from a ready, willing, and able purchaser, and this order is received by the company' even though actual delivery and payment may be made after termination of the agency and irrespective of whether or not the agency contract provides for payment of commissions after termination." *Leen v. Butter Co.*, 177 Wis. 2d 150, 153, 501 N.W.2d 847 (Ct. App. 1993) (quoting *Zweck v. D P Way Corp.*, 70 Wis. 2d 426, 430–31, 234 N.W.2d 921, 924 (1975)). T4K asserts that the doctrine is inapplicable in this case because there is no evidence that Northern Group procured an actual order from a retailer prior to termination. But Wisconsin courts generally recognize that "when the agent accomplishes the result for which he or she was retained a principal cannot avoid paying commissions by merely terminating the agency." *Id.*; *see also Harold Wright Co., Inc. v. E.I. DuPont De Nemours & Co., Inc.*, 49 F.3d 308, 309–10 (7th Cir. 1995) ("[T]he doctrine of procuring cause stands as well for the equally fundamental proposition that a party to a contract will not be permitted to take steps designed to prevent the other party from being compensated for the performance that he has already rendered."). An agent who seeks commissions for sales that are made after termination must prove two elements "(1) that the agency was terminated by the principal to avoid paying the commissions; and (2) that the agent

8

was the 'procuring cause' of the sales." *Leen*, 177 Wis. 2d at 154 (citing *Potomac Chem. Co. v. Chapman*, 146 F.2d 664, 665 (D.C. Cir. 1944)). This rule does not apply if the agency agreement limits the recovery of commissions following termination, however. *Id.* at 155.

In this case, while Northern Group does not dispute that, at the time of its termination, none of the retailers committed to purchase any certain quantity of products as a result of Northern Group's efforts to obtain a commitment, it asserts that, as a result of obtaining the commitments, Northern Group secured an agreement to purchase the product and is the procuring cause for all future orders of the product under the program. In other words, those retailer commitments to a planogram form the basis for all future product shipments and revenue to T4K for the life of the retail programs. Northern Group maintains that the agreement did not limit the recovery of commissions following termination, and the obligation to pay the commission on all such sales cannot be avoided by simply terminating the agreement.

For the reasons already explained, Northern Group has raised a material dispute of fact as to whether the commitments resulted in sales and whether subsequent work was required to be completed once the commitments were obtained after Northern Group's termination. T4K cannot avoid paying Northern Group for commissions if it terminated the oral agreement in order to not pay Northern Group commissions, and again, there is a genuine issue of material fact as to whether this is the case. Accordingly, the court denies T4K's motion for summary judgment on this basis.

**D. Wis. Stat. § 134.93**

Northern Group asserts that, under Wis. Stat. § 134.93, T4K is liable for commissions due, plus exemplary damages of up to 200%, for its failure to pay Northern Group's "independent sales representative" these commissions. In the absence of a written agreement that provides when a commission becomes due, a commission becomes due according to the past practice used by the

principal and the independent sales representative. Wis. Stat. § 134.93(2). T4K contends that the past practice between the parties is plain—T4K would pay Northern Group commission only upon T4K being paid on orders shipped to and paid by the retailers. But upon termination, T4K agreed to pay commissions on certain follow-up orders received and shipments made after the termination date. Northern Group contends that it did not receive commissions on certain follow-up orders. In short, a factual dispute exists as to whether T4K is liable for commissions due under their agreement. Summary judgment is therefore denied on this claim.

Northern Group also argues that T4K violated Wis. Stat. § 134.93(3) by failing to provide at least ninety days prior written notice of termination. *See* Wis. Stat. § 134.93(3) ("Unless otherwise provided in a written contract between principal and an independent sales representative, a principal shall provide an independent sales representative with at least 90 days' prior written notice of any termination, cancellation, nonrenewal or substantial change in the competitive circumstances of the contract between the principal and the independent sales representative."). T4K does not dispute that it terminated the relationship with Northern Group "effective immediately." Absent good cause for immediate termination, this would also seem to constitute a violation of the statute which may have resulted in further damages. For this reason, as well, T4K's motion for summary judgment must be denied.

## CONCLUSION

For the reasons explained above, T4K's motion for summary judgment (Dkt. No. 45) is **DENIED**.

**SO ORDERED** at Green Bay, Wisconsin this 30th day of December, 2019.

s/ William C. Griesbach  
William C. Griesbach, District Judge  
United States District Court